**STATE of Minnesota, CITY OF SPRING LAKE PARK,**
Appellant,

v.

**Steven Mark SEEKON, Respondent.**

No. C1–86–277.

Court of Appeals of Minnesota.

Aug. 26, 1986.
Review Denied Oct. 17, 1986.

Hubert H. Humphrey, III, Atty. Gen., William G. Clelland, Carson and Clelland, Minneapolis, for appellant.

Robert Munns, Anoka, for respondent.

Heard, considered and decided by RANDALL, P.J., and LANSING and HUSPENI, JJ.

## OPINION

HUSPENI, Judge.

This is a pretrial appeal by the State pursuant to Minn.R.Crim.P. 28.04, subd. 1(1) from an order suppressing incriminating statements made by an accused. We affirm.

## FACTS

Around 3:00 p.m. on August 4, 1985, Officers Michael Jensen and Willard Gleason of the Lino Lakes Police Department received a radio report from the Spring Lake Park Police Department regarding an alleged assault. They were informed that the driver of a brown heavy duty truck bearing the logo "Artic Sandblasting" and towing a generator had pointed a rifle at a passing motorist. The vehicle contained two males in their 20's, each with dark hair and a mustache. They were believed to be heading northbound into Lino Lakes.

About an hour later the officers observed the vehicle northbound on Lake Drive near the Artic Sandblasting facility. The vehicle was stopped and the two occupants were ordered out of the truck. A toy rifle was removed from the front seat of the truck. The driver of the truck, Ron Loeberg, was placed in Officer Jensen's squad car, and the passenger, Steven Seekon, was placed in the rear seat of Officer Gleason's car. Loeberg, upon being advised of the reason for the stop, stated that Seekon had pointed the gun at a passing motorist and mimicked the sound of gunfire by shouting "bang, bang, bang."

Seekon was then informed of the complaint and was asked to give his name, address and date of birth. Upon being told the reason for the stop Seekon admitted that he had pointed the rifle at a woman in a black car but stated he didn't think he was doing any harm. No further questions were asked. No *Miranda* warning was given. Both Loeberg and Seekon were released approximately fifteen minutes from the time they were originally stopped.

Seekon was charged with assault in the fifth degree, a misdemeanor under Minn. Stat. § 609.224 (Supp.1985). Following an omnibus hearing the trial court ruled that Seekon was in custody and that his admission was indirectly elicited by the officer. The trial court suppressed Seekon's statements and the state timely appealed. Respondent Seekon did not file a brief in this matter and we proceeded under Minn.R. Civ.App.P. 142.03.

## ISSUE

Did the trial court err in suppressing respondent's statements?

## ANALYSIS

### I.

In a pretrial appeal from an order suppressing evidence, the state must demonstrate "clearly and unequivocally the tri-

al court has erred in its judgment, and unless reversed, the error will have a critical impact on the outcome of the trial." *State v. Webber,* 262 N.W.2d 157, 159 (Minn.1977). We agree that any error would have a critical impact on this trial because the possibility of conviction is doubtful without the suppressed admission. *See State v. Lee,* 376 N.W.2d 259, 262 (Minn.Ct.App.1985). The admission is crucial to identity since the victim is unlikely to be able to make an in-court identification. Further, there were two parties in the truck, of similar age and description. Loeberg's whereabouts are unknown and his statements to the police are inadmissible hearsay. Without respondent's statements, the state may not be able to prove that respondent committed the assault, rather than his companion Loeberg.

## II.

Statements made by a suspect during custodial interrogation are inadmissible unless the suspect is first given a *Miranda* warning. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

In *State v. Herem,* 384 N.W.2d 880 (Minn.1986), a Minnesota Supreme Court opinion released after the trial court's decision in this matter, a traffic stop was effected after a high speed chase. The driver was placed in the back seat of the squad car. He was asked if he knew he was speeding, whether he had seen the patrol car, whether he had tried to run away, why he was speeding and whether he had been drinking. *Id.* at 881. The Minnesota Supreme Court, applying *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), held that the driver's responses were admissible in the absence of *Miranda* warnings. *Herem,* 384 N.W.2d at 884. In discussing whether Herem was in custody, the court equated cus-

tody with treatment which can fairly be characterized as the functional equivalent of a formal arrest. *Id.* at 883. The court stated that the fact that questioning occurs in the patrol car does not convert an ordinary traffic stop into a custodial interrogation.[1] *Id.*

We must decide whether the rationale of *Berkemer* and *Herem,* both traffic stop cases, should be extended to the facts of the present case, which evolved from a probable cause felony stop. We conclude it should not.

A review of both *Berkemer* and *Herem* supports our conclusion. In *Berkemer* the United States Supreme Court ruled that while roadside questioning of a motorist detained pursuant to a routine traffic stop did not constitute custodial interrogation, the moment the driver was formally arrested and directed to enter the squad car he was in custody and a *Miranda* warning should have been given. The nature of the stop was categorized by the *Berkemer* court as a routine traffic stop. 468 U.S. at ——, 104 S.Ct. at 3150.

*Herem* also involved an "ordinary traffic stop" 384 N.W.2d at 883, and concluded that "simply requiring defendant to sit in a police car for a short time, an act much less intimidating or coercive than an order delivered at gunpoint, did not take the situation beyond the realm of the ordinary traffic stop."[2] *Id.*

The stop here was not a routine traffic stop. It was a felony stop, one initiated, not by the officers' personal observations of driving conduct, but executed in response to a radio report of threatening use of a firearm. Both *Berkemer* and *Herem* emphasize the routine traffic stop setting. Because we are not convinced that either court would extend the scope of those rulings to encompass this fact situation, we decline to do so.

1. In *Herem,* the Minnesota Supreme Court reversed a Minnesota Court of Appeals decision which held that Herem was, in fact, in custody while being interrogated.

2. Officer Jensen testified that he did not draw his gun, nor did he see Officer Gleason draw his. We do not consider this factor to weaken the distinction to be drawn between a routine traffic stop and a probable cause felony stop.

We find no error in the trial court's observation:

> [T]his was not just a speeding stop. Of course, in a speeding stop you don't have to give *Mirandas*.
> This was, in your own testimony, a felony stop.

■ We next address the question of whether respondent's incriminating statements to Officer Jensen were elicited by custodial interrogation or were spontaneous and voluntary. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, mandates suppression only when both custody and interrogation are present and proper warnings are not given. If the statements were spontaneous and voluntary, even though made in custody, they need not be suppressed. However, the trial court found that, while respondent's incriminating statements were not directly elicited, they were indirectly elicited by an officer while the respondent was in custody and *Miranda* warnings should have been given.

We cannot conclude that the trial court clearly and unequivocally erred in its judgment. Respondent was intentionally placed in the back seat of the squad car and was powerless to leave while he was asked certain identification questions about himself. The officer then explained to respondent the nature of the serious charge for which respondent was under investigation. Once told the reason for the stop, respondent made the damaging admission that he had, in fact, pointed a toy rifle at a passing motorist. Respondent added that he didn't think he was doing any harm.

The trial court found that in this setting, even though respondent was not specifically asked his version of the facts or asked what his defense to the complaint was, his response was indirectly elicited by the police. Because it is the duty of the trial court to weigh the credibility and observe the demeanor of the witnesses in determining whether respondent's response was voluntary and spontaneous or was coerced by the setting, we acknowledge the proper exercise of that duty in regard to this issue.

## DECISION

The trial court's order suppressing respondent's admissions was not clearly erroneous.

**Affirmed.**

RANDALL, J., specially concurs.

LANSING, dissents.

RANDALL, Judge (concurring specially).

I concur with the majority's refusal to extend the rationale of *Berkemer* and *Herem* to felony stops. In addition, I submit that this case is distinguishable from *Herem* on its facts. *Herem* did not present a clear case of custody, respondent's fact situation does.

Here, following regular police procedure for a felony stop, respondent and his companion were instructed to leave their vehicle and put their hands on the police car in plain view. They were frisked for weapons and respondent was intentionally placed in the back seat of Officer Gleason's squad car where Officer Jensen talked to respondent.

The rear seat of Officer Gleason's squad car had been modified for prisoner transportation and that of other people the police might wish to hold in custody when they do not have immediate access to a formal jail. The door handles on the inside of the rear seat had been removed, and the squad car was equipped with iron mesh separating the front and the back seat. Anyone placed in the back seat of that squad car was in a confined custodial setting as if placed in a formal jail with bars.

These are the facts that were *not* present in *Berkemer*. In the Minnesota Supreme Court case of *Herem*, a footnote accepted the driver's contention that he had been placed in the rear of a patrol car, but there was no record as to whether the rear seat of that patrol car was equipped like the squad car in this case.

The "roadside questioning" evidenced in *Berkemer* and *Herem* could take place while a motorist is asked to sit in a police

car, if the request by the officer is for the sake of convenience while the officer both wishes to write the ticket and listen to his two-way radio.

Here, Officer Jensen intentionally and deliberately placed respondent in the rear seat of Officer Gleason's car to secure him in a custodial setting. He followed normal police procedures used when a felony suspect is stopped on a possible charge involving a dangerous weapon. At the pretrial hearing, Officer Jensen testified as follows:

A  Until we secured the situation, he was placed in the squad car for his safety and for ours, sir.

Q  That doesn't quite answer my question. Was he—could he have been allowed to leave at that point? Would he have been allowed to leave?

A  At that point, until we secured the area for safety, he was placed in the squad car.

Q  He would not have been allowed to leave?

A  No, sir.

Q  And the rear of the squad car—can it be exited by the passenger without assistance from the outside?

A  No, sir. They have to be opened from the outside.

Q  There are no handles on the inside doors; is that correct?

A  That's correct.

Q  And you can't crawl into the front because there's a screen preventing a passenger from getting to the front?

A  That's correct.

Given that explicit record, I am satisfied that the trial court correctly concluded that appellant was in custody when Officer Jensen interrogated him. To hold otherwise would be to place form over substance and to allow peace officers to incarcerate persons in the rear seat of squad cars that are modified to function as portable jails and then to interrogate those persons without the benefit of a *Miranda* warning until they have been delivered to the inside of a station house and placed in a stationary jail.

The *Miranda* holding that custody starts after a person has been taken into custody *or* otherwise deprived of his freedom in a significant way is still law. The driver in *Berkemer* was not deprived of his freedom in a significant way when standing on the shoulder of a highway talking to a police officer. This precise fact situation was not discussed in *Herem.* It must be discussed in this case as the locked aspect of the rear seat of the patrol car in question is conceded by the State and is not in controversy.

LANSING, Judge (dissenting).

I cannot agree that the law supports a rigid categorical distinction between felony and misdemeanor roadside stops in determining when a suspect is taken into custody for purposes of *Miranda*. Although roadside questioning significantly curtails the freedom of action of a motorist and may involve custodial interrogation, custody is determined by an objective standard. *McCarty v. Herdman*, 716 F.2d 361, 362 n. 1 (1984), *aff'd*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoting *Lowe v. United States*, 407 F.2d 1391, 1397 (9th Cir.1969)). The issue is whether this investigative stop elevated to the functional equivalent of a formal arrest. *See State v. Herem*, 384 N.W.2d 880 (Minn.1986); *United States v. Jones*, 759 F.2d 633 (1985). In deciding that issue, there is no valid basis for distinguishing between the investigative interrogation in *Herem*, determined to be noncustodial, and the interrogation here. Seekon and Gleason were detained and questioned for approximately 15 minutes and then released. Additionally, the statement which the State seeks to introduce did not result from interrogation, but was volunteered when Seekon was informed of the reason for the stop. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980); *State v. Jackson*, 351 N.W.2d 352, 355 (Minn.1984).